This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                              **NO. 29,559**

**DANIEL CONSAUL,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Douglas R. Driggers, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
Ralph E. Trujillo, Assistant Attorney General
Albuquerque, NM

for Appellee

Jacqueline L. Cooper, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**WECHSLER, Judge.**

Our opinion filed August 31, 2011 is hereby withdrawn, and this opinion is filed in its stead. We deny Defendant's motion for rehearing.

Defendant Daniel Consaul appeals from a judgment, order, and commitment convicting him of child abuse, contrary to NMSA 1978, Section 30-6-1(C), (D) (2005) (amended 2009), sentencing him to eighteen years imprisonment, and designating the offense as a serious violent offense (SVO), pursuant to the Earned Meritorious Deductions Act (EMDA), NMSA 1978, § 33-2-34 (2004) (amended 2006). On appeal, Defendant argues that (1) the State failed to present sufficient evidence that Defendant intentionally or negligently caused the victim's brain injuries, (2) Dr. Denise Coleman, an expert witness in critical care pediatrics and child abuse, impermissibly told the jury that the victim's injuries were caused by child abuse, (3) Dr. Mary Johnson, an expert witness in pediatric neurology, impermissibly commented on the veracity of Defendant when she testified that because Defendant's story changed she suspected child abuse, (4) the district court erred in denying defense counsel's request for separate jury instructions and separate verdict forms for negligent child abuse and intentional child abuse, (5) the district court erred in determining that it could not mitigate Defendant's sentence, and (6) the district court erred in determining that Defendant's offense was an SVO. We affirm.

## BACKGROUND

The State charged Defendant with one count of child abuse resulting in great bodily harm after ten-week-old Jack Consaul suffered neurological injuries (brain injuries) while in Defendant's care. Defendant is Jack's uncle and occasional caretaker. Defendant babysat Jack on the night Jack suffered his brain injuries while Jack's mother, Defendant's sister, Heidi Consaul (Heidi) worked. The criminal complaint alleged that Defendant either "knowingly, intentionally or negligently and without justifiable cause, permitted or caused Jack . . . to be placed in a situation that may endanger the child's life or health, which resulted in [Jack] suffering great bodily harm."

Defendant's version of events derived from two interviews with Detective Mark Meyers that occurred shortly after the incident. In the first interview, Defendant stated that Jack was sleeping in his crib when he suddenly cried out. Defendant rushed to the bedroom and found that Jack had vomited in the crib and appeared rigid. In his second interview, which occurred once the doctors treating Jack began to suspect child abuse, Defendant admitted to getting frustrated with Jack because Jack would not stop crying. Defendant admitted swaddling Jack tightly with a blanket and placing Jack face down on a pillow in the crib for at least an hour. Defendant checked on Jack once and observed that Jack seemed to be fine and sleeping. Shortly after checking on

Jack, Defendant heard Jack scream and found that Jack had vomited and appeared rigid. He called Heidi and a neighbor, and they both rushed to the apartment. They took Jack to an emergency room in Las Cruces, and Jack was subsequently airlifted to the University of New Mexico Hospital (UNMH).

Initially, the pediatrician on call at the emergency room, Dr. Hernan Ciudad, thought Jack had an infection and that his symptoms were due to septic shock. The pediatric intensivist at UNMH who initially treated Jack, Dr. Dawn Joseph, also believed that Jack suffered from a bacterial infection and was in septic shock. Once Jack's cultures came back negative for infection, Dr. Joseph determined that Jack was not in septic shock and could not find anything else wrong with Jack. Shortly thereafter, CT and MRI scans revealed that Jack suffered brain damage, brain swelling, and ischemia, which is insufficient blood flow to the brain.

On the second day in the hospital, Jack suffered a seizure that could not be contained with anti-seizure medication. Dr. Joseph called Dr. Mary Johnson, a pediatric neurologist at UNMH, to provide a consultation due to Jack's seizure. Dr. Johnson suggested that Jack may have suffered from suffocation, and Dr. Joseph concurred that suffocation explained all of Jack's symptoms. Once the UNMH doctors determined that suffocation caused Jack's injuries, a child abuse investigation began.

4

The State charged Defendant, in the alternative, with negligent child abuse and intentional child abuse. With regard to the negligent child abuse charge, the State's theory was that Jack's injuries were caused by Defendant swaddling Jack too tightly and placing him face down out of frustration, actions that the State argued amount to gross recklessness for the safety and welfare of Jack. Regarding the intentional child abuse charge, the State's theory of the case was that swaddling Jack and placing him face down would not cause such severe brain injuries and therefore Defendant intentionally suffocated Jack to get him to stop crying. Defendant presented evidence and argued that Jack's injuries were not caused by suffocation while Jack was in Defendant's care and instead that Jack suffered brain damage while at UNMH caused by excessive fluid given to Jack in order to treat the original diagnosis that Jack suffered from septic shock as a result of an infection.

Defendant requested a separate jury instruction and separate verdict forms for negligent child abuse and intentional child abuse. The district court denied Defendant's request and provided the jury with a single jury instruction, which included the mens rea for negligent and intentional child abuse in the alternative and a general verdict form. The jury returned a general verdict convicting Defendant of child abuse. At Defendant's sentencing hearing, the district court sentenced Defendant to a basic sentence of eighteen years. The district court did not consider

mitigating factors at the sentencing hearing, reasoning that because our Supreme Court declared NMSA 1978, Section 31-18-15.1 (1993) (amended 2009), facially unconstitutional, it did not have discretion to consider mitigating factors. The district court further found that Defendant's conviction was an SVO under the EMDA, Section 33-2-34(L)(4)(o)(9), finding that Defendant acted intentionally in causing Jack's brain injuries.

On appeal, Defendant argues that (1) the State failed to present sufficient evidence that Defendant intentionally or negligently caused Jack's brain injuries, (2) Dr. Coleman, an expert witness in critical care pediatrics and child abuse, impermissibly told the jury that Jack's injuries were caused by child abuse, (3) Dr. Johnson, an expert witness in pediatric neurology, impermissibly commented on the veracity of Defendant when she testified that because Defendant's story changed she suspected child abuse, (4) the district court erred in denying defense counsel's request for separate jury instructions and separate verdict forms for negligent child abuse and intentional child abuse, (5) the district court erred in determining that it lacked discretion to mitigate Defendant's sentence, and (6) the district court erred in determining that Defendant's offense was an SVO. We affirm.

**SUFFICIENCY OF THE EVIDENCE**

**Standard of Review**

Defendant argues that the State failed to present sufficient evidence that Defendant either intentionally or negligently caused Jack's brain injuries. Because the jury returned a general verdict, we address whether sufficient evidence supported Defendant's convictions for both negligent child abuse and intentional child abuse. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sena*, 2008-NMSC-053, ¶ 10, 144 N.M. 821, 192 P.3d 1198 (internal quotation marks and citation omitted). "[S]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *State v. Baca*, 1997-NMSC-059, ¶ 14, 124 N.M. 333, 950 P.2d 776 (internal quotation marks and citation omitted). We view the evidence in the light most favorable to, and indulge all inferences in favor of, the verdict. *Sena*, 2008-NMSC-053, ¶ 10; *State v. Sanders*, 117 N.M. 452, 456, 872 P.2d 870, 874 (1994). If there is sufficient evidence supporting the verdict, we do not reweigh the evidence or substitute our judgment for that of the factfinder. *State v. Fuentes*, 2010-NMCA-027, ¶ 13, 147 N.M. 761, 228 P.3d 1181.

**Negligent Child Abuse**

In order to convict Defendant of negligent child abuse, the State had to prove beyond a reasonable doubt that (1) Defendant endangered the life or health of Jack,

7

(2) Defendant acted with reckless disregard, (3) Defendant's actions or failure to act resulted in great bodily harm to Jack, and (4) Jack was under the age of eighteen. *See* UJI 14-602 NMRA. In order to find that Defendant acted with reckless disregard, the State had to prove that Defendant knew or should have known that his conduct created a substantial and foreseeable risk, that he disregarded that risk, and that he was wholly indifferent to the consequences of the conduct and the welfare and safety of Jack. *See id.*

Defendant first argues that there was insufficient evidence as to the third element, that Defendant's actions caused Jack's injuries. Specifically, Defendant notes that the State's theory of negligence in this case was that Defendant "swaddled Jack tightly and put him face down in his crib" and that these actions "would [not] cause the type of injuries seen in" Jack. In support, Defendant notes that several experts testified that Jack's injuries were not consistent with being swaddled and placed face down in his crib. Dr. Joseph testified that it was unlikely that Jack's injuries were caused by being swaddled and placed face down in the crib because Jack was a "two-and-a-half-month-old who was able to lift [his] head . . . back and forth . . . and he was developing normally." Dr. Coleman similarly testified that placing Jack face down in the crib was insufficient to cause Jack's injuries, particularly since she received reports that Jack woke up crying.

8

However, the State presented contrary evidence that Defendant's manner of swaddling Jack and placing him face down on a pillow was consistent with Jack's brain injuries. Dr. Blaine Hart, a radiologist at UNMH who reviewed Jack's MRI and CT scans, testified that the brain injuries were consistent with placing a baby face down on a pillow for an hour so that the baby could not get a sufficient supply of oxygen. Dr. Joseph similarly testified that Defendant's actions could explain everything that was medically wrong with Jack. Looking at the evidence in the light most favorable to the verdict, this testimony was sufficient for a reasonable jury to conclude that Defendant swaddling Jack in a blanket and placing him face down on a pillow in his crib caused Jack's brain injuries. *See Sena*, 2008-NMSC-053, ¶ 10; *Baca*, 1997-NMSC-059, ¶ 14. The jury was free to disregard the contrary evidence, and we therefore decline to reweigh the evidence and substitute our judgment for that of the factfinder. *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829*; Fuentes*, 2010-NMCA-027, ¶ 13.

Defendant argues that, even assuming that Defendant swaddling Jack and placing him face down in his crib caused Jack's injuries, Defendant did not act with reckless disregard. Indeed, our Supreme Court has interpreted the mens rea element of negligence in the child abuse statute to require a showing of criminal negligence instead of ordinary negligence. *Santillanes v. State*, 115 N.M. 215, 221-22, 849 P.2d

358, 364-65 (1993). Criminal negligence requires "proof that the defendant knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child." *Id*. at 222, 849 P.2d at 365.

Detective Meyers testified that he took two statements from Defendant shortly after the incident. In the first statement, Defendant denied that anything happened that would explain Jack's condition. However, in the second interview, Defendant told Detective Meyers that he began to get frustrated that Jack would not stop crying and he therefore swaddled Jack "quite a bit tighter" than usual. In addition to bundling Jack tighter than usual, he bundled Jack "hastily" because he was frustrated. Defendant then placed Jack face down in his crib "to get him to stop crying" and "because he was aggravating me with his crying[.]" Defendant subsequently left the room for over an hour. Jack's age along with Defendant's statements that he wrapped Jack tightly and hastily in a blanket while aggravated, laid him face down on a pillow in a manner to get him to stop crying, and left him in a room with no supervision for over an hour was sufficient for a reasonable jury to conclude that Defendant created a substantial and foreseeable risk, that he disregarded that risk, and that he was wholly indifferent to the consequences of the conduct and the welfare and safety of Jack. *See* UJI 14-602; *cf. State v. Chavez*, 2007-NMCA-162, ¶ 10, 143 N.M. 126, 173 P.3d 48 (holding that there was sufficient evidence of negligent child abuse when the

defendant placed a child, not yet six months old and swaddled in blankets, on a low youth bed, with no rails, nine inches from a space heater and fell asleep on the couch leaving the child unsupervised). Sufficient evidence therefore supported Defendant's conviction if the conviction was based on negligent child abuse.

We also note Defendant's argument that Jack's mother testified that she often put Jack to sleep in the same manner, swaddled and on his stomach, and that therefore Defendant could not have foreseen the risk of harm to Jack. However, Defendant's argument is not supported by the record. Jack's mother testified that Jack slept on both his stomach and his back on occasion, but that when she placed Jack on his stomach, she did not swaddle him.

**Intentional Child Abuse**

In order to convict Defendant of intentional child abuse, the State had to prove beyond a reasonable doubt that (1) Defendant tortured or cruelly punished Jack, (2) Defendant acted intentionally, (3) Defendant's actions or failure to act resulted in great bodily harm to Jack, and (4) Jack was under the age of eighteen. *See* UJI 14-602. Defendant challenges the third element and argues that the State presented insufficient evidence that his actions caused Jack's injuries. Specifically, Defendant argues that the State failed to prove that Defendant intentionally caused Jack's injuries because (1) there were no physical manifestations of suffocation on Jack, and (2) there

was conflicting evidence regarding the cause of Jack's injuries.

Regarding his first argument, we acknowledge that there was uncontroverted testimony that there were no physical manifestations of suffocation on Jack. However, Dr. Coleman, a pediatric intensivist at UNMH who took over care for Jack on October 14, testified that physical manifestations were only found in fifty percent of suffocation cases. She further stated that placing a hand over a child's mouth could deprive the child of oxygen and fully explain the injuries that Jack suffered. It was therefore possible that intentional suffocation caused Jack's injuries without physical manifestations based on the evidence presented at trial. *See Sanders*, 117 N.M. at 457, 872 P.2d at 875 ("Testimony by a witness whom the factfinder has believed may be rejected by an appellate court only if there is a physical impossibility that the statements are true or the falsity of the statement is apparent without resort to inferences or deductions.").

Regarding his second argument, Defendant claims the evidence established that Jack's injuries were caused by excessive fluid resuscitation used to treat Jack for shock at the emergency room in Las Cruces and at UNMH and not by suffocation. In support, Defendant points out that Dr. Martin Jose Boyd, an expert witness in emergency medicine, testified that it is indeed possible to give too much fluid, that it can make swelling of the brain worse, and that he did not disagree that Jack had brain

injuries before being brought to the emergency room. Additionally, Defendant's expert, Dr. Jearl Lindley, testified that (1) excess fluid can cause swelling in the brain, (2) the amount of fluid given to Jack could have devastating effects, and (3) he believed that Jack's brain injuries occurred at UNMH due to excess fluid resuscitation. Specifically, Dr. Lindley testified, using an exhibit, that a total of 1280 ml of fluid was given to Jack, 954 ml of which Jack did not urinate out, that Jack's average blood volume is 350 ml, and that giving a baby fluid equal to twice the average blood volume could cause brain swelling and explain Jack's injuries.

While the testimony of Dr. Boyd and Dr. Lindley may support a reasonable conclusion that excess fluid resuscitation at UNMH caused Jack's brain injuries, the State presented sufficient contrary evidence that excess fluid resuscitation does not cause brain swelling and that Jack's injuries were caused by suffocation. Dr. Hart testified that Jack's brain injuries were consistent with suffocation. Although he acknowledged that there were a variety of possible causes, he testified that Jack's brain injuries were not consistent with excess fluid resuscitation. Dr. Joseph testified that Jack's symptoms were consistent with suffocation. Additionally Dr. Joseph testified that there is "no basis in any medical literature" that excess fluid can cause brain swelling. Dr. Johnson similarly testified that Jack suffered brain damage caused by a lack of oxygen to the brain. Dr. Johnson testified that she had never seen a child

suffer a serious brain injury from fluid resuscitation and, additionally, there was nothing to indicate that the fluid given to Jack was excessive. Based on this evidence, a jury could reasonably conclude that Jack's injuries were caused by intentional suffocation and not excess fluid resuscitation. We therefore decline the invitation to reweigh the evidence and substitute our judgment for that of the jury. *See Fuentes*, 2010-NMCA-027, ¶ 13. Sufficient evidence therefore supported Defendant's conviction if the conviction was based on intentional child abuse.

**EXPERT TESTIMONY**

**Standard of Review**

Defendant argues that (1) Dr. Coleman impermissibly told the jury that Jack's injuries were caused by child abuse, and (2) Dr. Johnson impermissibly commented on the veracity of Defendant by telling the jury that because Defendant changed his story, she suspected child abuse. Defendant concedes that he did not preserve either issue below, and we therefore review only for fundamental error. *See State v. Davis*, 2009-NMCA-067, ¶ 7, 146 N.M. 550, 212 P.3d 438. Fundamental error is error that goes to the foundation of the case or implicates a right so essential to the defense that no court should permit the defendant to waive. *State v. Johnson*, 2010-NMSC-016, ¶ 25, 148 N.M. 50, 229 P.3d 523. "Fundamental error only applies in exceptional circumstances when guilt is so doubtful that it would shock the judicial conscience to

14

allow the conviction to stand." *Id.* (internal quotation marks and citation omitted).

**Dr. Coleman**

Dr. Coleman provided a consult on Jack on October 11 and took over care for Jack from October 14-18. She opined that swaddling Jack and putting him face down on a pillow would not cause his severe brain injuries. She testified that, because Jack was ten weeks old and therefore able to lift his head on his own, there must have been significant suffocation where Jack was unable to escape in order to explain the severity of the brain injuries. At the conclusion of her testimony, the State asked Dr. Coleman whether she formed "an opinion as to what caused Jack's injury." Dr. Coleman responded "yes" and opined that Jack's injuries were the result "[o]f an intentional suffocation. So it's child abuse."

Defendant argues that Dr. Coleman's statement that "it's child abuse" was impermissible causation testimony. Indeed, our Supreme Court has held that an "expert will not be allowed to state an opinion in terms of causality[.]" *State v. Alberico*, 116 N.M. 156, 176, 861 P.2d 192, 212 (1993) (holding that an expert may not testify that the victim's symptoms "were in fact caused by sexual abuse"). The *Alberico* Court held that such causation testimony "encroaches too far upon the province of the jury to determine the truthfulness of the witnesses." *Id.* Dr.

15

Coleman's testimony that "it's child abuse" was therefore improper causation testimony. While the State cites *Davis*, 2009-NMCA-067, ¶ 20, for the proposition that an expert is permitted to offer an opinion as to whether actual injuries suffered by a victim are consistent with child abuse, that characterization does not accurately describe the testimony in this case. Dr. Coleman did not testify that Jack's injuries were consistent with child abuse; she testified that it was child abuse.

However, as noted, because Defendant failed to preserve the issue in the district court, we only review for fundamental error. Under this standard of review, we cannot say that the testimony denied Defendant a fair trial or that without Dr. Coleman's testimony that Defendant's "guilt is so doubtful that it would shock the judicial conscience to allow the conviction to stand." *Johnson*, 2010-NMSC-016, ¶ 25 (internal quotation marks and citation omitted). As we discussed in addressing the sufficiency of the evidence for Defendant's convictions, the State presented substantial evidence supporting Defendant's child abuse conviction in the form of testimony regarding the events leading to Jack's injuries, that the injuries were consistent with child abuse, and that the injuries were not consistent with Defendant's version of events. Dr. Coleman's improper causation testimony did not rise to the level of fundamental error. *See State v. Barber*, 2003-NMCA-053, ¶ 8, 133 N.M. 540, 65 P.3d 1095 ("Where there is substantial evidence . . . to support the verdict of the

jury, we will not resort to fundamental error." (internal quotation marks and citation omitted)).

**Dr. Johnson**

In addition to her testimony regarding Jack's injuries and treatment, Dr. Johnson also testified regarding Defendant not reporting to the doctors at UNMH that he swaddled Jack and laid him face down in the crib until several days after the incident. She testified that "the thing that stood out was this change in story, the change in the history from the time [Jack] was admitted to the ER." She stated that "[i]t was later–and this is very typical of child abuse–it was only later, and it was three days later after he was initially admitted to UNM[H], that the first indication of [Jack] being wrapped or swaddled and placed on his tummy on a pillow was heard about." Further, she testified that "the history changed. This is classic in . . . child abuse cases, and I've seen all too many of them." Defendant argues that this testimony by Dr. Johnson was improper because it was a comment on the veracity of Defendant.

While the State concedes that the "credibility of witnesses is to be determined by the jury," *see State v. Duran*, 2006-NMSC-035, ¶ 21, 140 N.M. 94, 140 P.3d 515, we disagree that Dr. Johnson's testimony commented on the veracity of Defendant. Dr. Johnson testified only that the history changed three days after Jack was brought to the ER and that changes in histories are consistent with child abuse cases. A

qualified expert may properly testify, based on experience, that the facts of the case are consistent with a crime. *See State v. Wilson*, 2011-NMSC-001, ¶¶ 29-38, 149 N.M. 273, 248 P.3d 315 (holding that an expert's opinion that the victim's cause of death was consistent with smothering was admissible). Dr. Johnson did not testify that Defendant's version of the events were untruthful and did not directly challenge the credibility of Defendant and therefore her testimony was not improper. *See State v. Neswood,* 2002-NMCA-081, ¶¶ 6, 19, 132 N.M. 505, 51 P.3d 1159 (holding that expert testimony explaining how and why recantation occurs in child abuse cases was not improper commentary on the veracity of a witness in a case in which the victim recanted prior accusations against the defendant); *cf. Duran*, 2006-NMSC-035, ¶¶ 21-22 (holding that it is improper for the prosecution to elicit testimony by direct inquiries as to whether witnesses were "lying").

**JURY INSTRUCTION AND GENERAL VERDICT FORM**

The district court provided the jury with a single instruction, stating that to find Defendant guilty of child abuse resulting in great bodily harm, the State had to prove that (1) Defendant either caused Jack to be placed in a situation that endangered his life or health, or, tortured or cruelly punished Jack, (2) Defendant acted intentionally or with reckless disregard, and (3) Defendant's actions or failure to act resulted in great bodily harm to Jack. The district court denied Defendant's request for separate

18

verdict forms and jury instructions for negligent child abuse and intentional child abuse, and the jury returned a general guilty verdict against Defendant. On appeal, Defendant contends that the single instruction and the general verdict form violate Rule 5-611(A) NMRA and Article II, Section 18 of the New Mexico Constitution, because it allowed the jury to convict Defendant without a unanimous verdict.

"Our review of this appeal is de novo, because the propriety of jury instructions given or denied is a mixed question of law and fact." *State v. Henley*, 2010-NMSC-039, ¶ 12, 148 N.M. 359, 237 P.3d 103 (alteration, internal quotation marks, and citation omitted). The due process clause of Article II, Section 18 of the New Mexico Consitution requires a "unanimous verdict on the crime charged . . . for conviction in a criminal case." *State v. Salazar*, 1997-NMSC-044, ¶ 39, 123 N.M. 778, 945 P.2d 996. "However, common law analyses of due process have not required jury unanimity on a particular theory of the crime charged." *Id.*; *see State v. Fry*, 2006-NMSC-001, ¶ 18, 138 N.M. 700, 126 P.3d 516.

Defendant argues that negligent child abuse and intentional child abuse are different crimes, not different theories of a single crime. However, this Court addressed whether a general verdict and a single jury instruction in a child abuse case violated the defendant's right to a unanimous verdict in *State v. Utter*, 92 N.M. 83, 582 P.2d 1296 (Ct. App. 1978). The child abuse statute in effect at the time provided

19

that "[a]buse of a child consists of a person knowingly, intentionally or negligently" abusing a child. *Id.* at 85, 582 P.2d at 1298 (internal quotation marks and citation omitted). The jury instruction provided that the state prove "[t]hat [the d]efendant did this act knowingly, intentionally or negligently." *Id.* (internal quotation marks omitted). This Court held that the instruction was not "legally deficient" because of the "alternative intent requirements" because it followed the language of the statute. *Id.* at 86, 582 P.2d at 1299. Underlying this rationale was the conclusion that child abuse is "one crime which could be committed in possibly varying ways." *Id.* In this case, the relevant portions of Section 30-6-1(D), the child abuse statute, are identical to the statute in *Utter*. *See* § 30-6-1(D) (stating that "[a]buse of a child consists of a person knowingly, intentionally or negligently" abusing a child). It was therefore not "legally deficient" for the district court to deny Defendant's request for separate jury instructions and a special verdict form because child abuse is "one crime which could be committed in possibly varying ways." *Utter*, 92 N.M. at 86, 582 P.2d at 1299; *see also State v. Dobbs*, 100 N.M. 60, 70-71, 665 P.2d 1151, 1161-62 (Ct. App. 1983) (relying on *Utter* in upholding single jury instruction and general verdict forms for five alternative charges of contributing to a delinquency of a minor because there was no indication that the jury reached a non-unanimous verdict).

Defendant argues that "*Utter* is inapplicable to this case, because in *Utter* the

20

jury was instructed that the verdict had to be unanimous." Defendant's argument is premised on an assertion that the State informed the jury that a unanimous verdict regarding the theory of child abuse was not required during its closing argument. This argument is apparently predicated on the State telling the jury that "you can all go back there and talk about it and you might think, 'Gosh, I think he did this on purpose,' or some of you might think, 'I just think [Defendant is] an idiot and he wanted [Jack] to shut up, and he put him face down in there,' but everybody knows, and we know he knew better to do that because [Defendant] wouldn't tell anyone." Viewing this statement in context, this statement was not a statement to the jury that they did not have to agree on the underlying theory of child abuse. Instead, the State was arguing to the jury that Defendant's actions toward Jack were not mere negligence but instead rose to the level of intentional or criminal negligence. *See Santillanes*, 115 N.M. at 222, 849 P.2d at 365 (holding that in order for a jury to convict a defendant of negligent child abuse, the defendant's action must be criminally negligent, meaning he acted with reckless disregard and knew or should have known the danger involved, rather than ordinary civil negligence). The State was attempting to convince the jury that Defendant acted either intentionally or with reckless disregard and knowledge of danger to Jack if Defendant caused Jack to suffocate by swaddling Jack and placing him face down on a pillow. Further, as in *Utter*, 92 N.M.

21

at 86, 582 P.2d at 1299, the district court provided the jury with an instruction that the verdict must be unanimous. *See also State v. Cavanaugh*, 116 N.M. 826, 831, 867 P.2d 1208, 1213 (Ct. App. 1993) (holding that the district court's decision to not allow the defendant to poll the jury on unanimity did not deny the defendant his right to a unanimous verdict despite a general verdict and a jury instruction stating alternative theories of guilt because the court provided the jury with an instruction that the verdict must be unanimous).

Defendant further argues that *Utter* is no longer good law in light of our Supreme Court's decisions in *Santillanes* and *State v. Schoonmaker*, 2008-NMSC-010, 143 N.M. 373, 176 P.3d 1105. In *Santillanes*, our Supreme Court held that the district court erred in failing to instruct the jury on the correct definition of "negligence" now in Section 30-6-1(D). *Santillanes*, 115 N.M. at 222, 849 P.2d at 365. Our Supreme Court held that the proper definition of "negligence" in what is now Section 30-6-1(D) is the criminal negligence standard as opposed to the civil negligence standard. *Santillanes*, 115 N.M. at 222, 849 P.2d at 365. *Santillanes* did not overrule, nor does it conflict with, *Utter*.

In *Schoonmaker*, 2008-NMSC-010, our Supreme Court upheld this Court's conclusion in *State v. Schoonmaker*, 2005-NMCA-012, ¶ 27, 136 N.M. 749, 105 P.3d 302, *rev'd, in part, on other grounds by* 2008-NMSC-010, that "the crime of

intentional child abuse is not the same crime or lesser included crime of negligent child abuse." Schoonmaker, 2008-NMSC-010, ¶ 46 n.4. *Schoonmaker* was a case that addressed whether intentional child abuse and negligent child abuse are separate crimes in the context of a multiple prosecution double jeopardy argument. *Schoonmaker*, 2005-NMCA-012, ¶¶ 18-19. In multiple prosecution double jeopardy cases, "statutes that are pled in the alternative . . . are treated as separate offenses." *Id.* ¶ 20. In addressing multiple prosecution cases, the court must then apply the two-part *Blockburger* test, which examines whether the defendant's conduct violates both statutes and, if so, whether one offense is subsumed within the other. *Id.* ¶ 21. The *Schoonmaker* Court applied the *Blockburger* test and concluded that negligent child abuse and intentional child abuse are separate offenses for double jeopardy purposes and therefore allowed the state to retry the defendant after a mistrial for negligent child abuse even though the jury acquitted the defendant of intentional child abuse. *Id.* ¶¶ 2, 18, 28.

We disagree with Defendant that *Schoonmaker* conflicts with *Utter*. Our Supreme Court, in the unanimous jury verdict context, has upheld a general verdict where the state presented two alternative theories of a first degree murder with a different mens rea element. *See Salazar*, 1997-NMSC-044, ¶ 42 (upholding a general verdict where the state tried the defendant on two theories of first degree murder:

deliberate intent and depraved mind murder); *see also Fry*, 2006-NMSC-001, ¶ 25 (relying on *Salazar* to uphold a general verdict of first degree murder where the state tried the defendant under felony murder and deliberate intent murder theories). Our Supreme Court in *Salazar*, 1997-NMSC-044, ¶¶ 41-42, reasoned that deliberate intent murder and depraved mind murder "reasonably reflect notions of equivalent blameworthiness or culpability[,]" and that they are "treated and punished in the same manner" by the Legislature (internal quotation marks and citation omitted). This rationale applies to negligent child abuse and intentional child abuse. Both negligent child abuse and intentional child abuse are codified in the same section of the same statute and are punished as first degree felonies where the abuse results in great bodily harm. Section 30-6-1(D)(1), (E). Further, this Court in *Schoonmaker* noted that negligent child abuse and intentional child abuse "protect children from two distinct but equally dangerous behaviors." *Schoonmaker*, 2005-NMCA-012, ¶ 27. Although *Schoonmaker* in its holding, refers to negligent child abuse and intentional child abuse as separate "crime[s]," the opinion also states that "the evidence may be sufficient to charge both offenses as alternative theories." *Id.* Based on our Supreme Court's analysis in *Salazar* and *Fry* and this Court's holding in *Utter*, the district court did not err in denying Defendant's request for separate jury instructions and special verdict forms.

**SENTENCING**

**Standard of Review**

Defendant makes two arguments regarding his sentencing: (1) the district court incorrectly believed that it could not mitigate Defendant's sentence because our Supreme Court declared Section 31-18-15.1 facially unconstitutional, and (2) the district court erroneously found that Defendant's offense was an SVO. We review a district court's sentencing for an abuse of discretion. *State v. Jensen*, 1998-NMCA-034, ¶ 19, 124 N.M. 726, 955 P.2d 195. "However, our review of the application of the law to the facts is conducted de novo." *State v. Martinez*, 2008-NMSC-060, ¶ 10, 145 N.M. 220, 195 P.3d 1232 (internal quotation marks and citation omitted). "A misapprehension of the law upon which a court bases an otherwise discretionary evidentiary ruling is subject to de novo review." *Id.*

**Mitigation**

At the sentencing hearing, the district court determined that it had no discretion to consider mitigating circumstances because our Supreme Court declared the statute providing that a judge may enter factual findings and in his discretion mitigate a sentence, Section 31-18-15.1, unconstitutional. The district court found, for purposes of appeal, that Defendant does not have a prior felony criminal record and does not have prior bad acts that would indicate a propensity for violence. However, these

25

mitigating factors were not ultimately considered. Defendant argues that the district court abused its discretion because Section 31-18-15.1 was declared unconstitutional regarding aggravation, not mitigation of a sentence.

In *State v. Frawley*, 2007-NMSC-057, ¶ 22, 143 N.M. 7, 172 P.3d 144, our Supreme Court held that the district court violated the defendant's Sixth Amendment right to trial by jury by altering the defendant's sentence upward in accordance with Section 31-18-15.1(A). The version of Section 31-18-15.1(a) in effect at the time provided that a judge may alter the basic sentence "upon a finding by the judge of any mitigating or aggravating circumstances surrounding the offense or concerning the offender." *Frawley*, 2007-NMSC-057, ¶ 8 (internal quotation marks and citation omitted). The *Frawley* Court recognized, based on the United States Supreme Court's decision in *Cunningham v. California*, 549 U.S. 270 (2007), that "the Sixth Amendment is violated *any time* a defendant is sentenced above what is authorized *solely* by the jury's verdict alone." *Frawley*, 2007-NMSC-057, ¶ 23. As a result, the *Frawley* Court determined that Section 31-18-15.1 was facially unconstitutional because it required that the judge, not the jury, issue findings of any aggravating or mitigating circumstances. *Frawley*, 2007-NMSC-057, ¶¶ 22, 25. Therefore, at the time the district court sentenced Defendant, Section 31-18-15.1 had no effect as a result of being facially unconstitutional. The district court therefore did not abuse its

discretion in not considering mitigating circumstances when sentencing Defendant because the district court did not have discretion to alter Defendant's sentence.

We acknowledge that *Frawley* and *Cunningham* were cases that involved aggravation, not mitigation, of the defendant's sentence. While Defendant argues that the holding of *Frawley* is inapplicable to mitigation and therefore the district court could issue factual findings apart from the jury verdict and, in its discretion, mitigate Defendant's sentence, the *Frawley* Court considered whether the statute was severable. *Frawley*, 2007-NMSC-057, ¶¶ 25-29. It concluded that "as written, [Section 31-18-15.1] can never be applied in a manner consistent with the Sixth Amendment." *Frawley*, 2007-NMSC-057, ¶ 25. Further, the *Frawley* Court addressed "the issue of whether we should attempt to temporarily remedy the constitutional deficiency." *Id.* ¶ 30. However, it concluded that "the question of how to ultimately fix the constitutional problem . . . lies with the Legislature." *Id.* Indeed, our Legislature did amend Section 31-18-15.1, effective July 2009, to cure the constitutional deficiencies. *See* 2009 N.M. Laws, ch. 163, § 1. However, the amended Section 31-18-15.1 took effect after Defendant's February 2009 sentencing.

**Serious Violent Offense**

Defendant argues that the district court erred in finding that Defendant's offense was an SVO under the EMDA, Section 33-2-34. Section 33-2-34(L)(4)(o)(9)

27

provides that a district court may designate child abuse to be a SVO based on the "nature of the offense and the resulting harm." In order to find that a crime is an SVO, a district court must find that the crime was "committed in a physically violent manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm." *State v. Morales*, 2002-NMCA-016, ¶ 16, 131 N.M. 530, 39 P.3d 747. A district court is required to "make specific findings both to inform the defendant being sentenced of the factual basis on which his good time credit is being substantially reduced, and to permit meaningful and effective appellate review of the court's designation." *State v. Loretto*, 2006-NMCA-142, ¶ 12, 140 N.M. 705, 147 P.3d 1138.

Defendant argues that the district court failed to meet *Loretto*'s requirements of specific findings because the district court's only finding was a bald assertion that Defendant acted intentionally. Indeed, the district court found "that the acts taking place in this case, the intentional child abuse resulting in great bodily harm, is sufficient to establish a [SVO]." However, the district court elaborated that its conclusion was

> [b]ased on the conviction and the manner in which the testimony was presented at trial that swaddling and placing the child face down on the crib would not be sufficient cause for the child to suffocate. One witness testified that a child of this age would be able to hold his head up and avoid suffocation, that without there being an eyewitness present other

28

than [D]efendant to testify [about] what occurred, the experts could not say specifically what occurred. The experts stated that [D]efendant's version of what occurred would not have caused the severe injuries or the suffocation of this child . . . the court is calling it a reasonable inference to be drawn from the facts set forth from the witness stand.

The district court therefore based the SVO designation of the crime on a determination that, considering the severity of Jack's injuries, Defendant must have acted intentionally based on testimony that Defendant's explanation of swaddling Jack and laying him face down in the crib could not cause Jack's injuries. He specifically cited expert testimony that Jack's injuries were not caused by Defendant swaddling and placing him face down in the crib because a baby developed at the level of Jack could hold his head up. These findings were specific enough to meet the *Loretto* standard because the findings specifically informed Defendant "of the factual basis on which his good time credit [was] substantially reduced" and were based on reasonable inferences from the evidence presented at trial. *See Loretto*, 2006-NMCA-142, ¶ 12; *see also State v. Abril*, 2003-NMCA-111, ¶ 26, 134 N.M. 326, 76 P.3d 644 (holding that this Court will not reverse a determination that a general verdict of child abuse is an SVO when "the record satisfies us that a rational jury could have found that [the d]efendant intentionally caused [the victim's] injuries").

**CONCLUSION**

For the foregoing reasons, we affirm.

29

**IT IS SO ORDERED.**

_____
**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

_____
**CYNTHIA A. FRY, Judge**